Case number 20-5160, Charles K. Hudson v. David Longley Bernhardt, in his official capacity as Secretary of the Interior et al. Appellants. Ms. Giron for the Appellants, Mr. Sullivan for the Appellee. Good morning, Council. Ms. Herron, please proceed when you're ready. Thank you, Your Honor. May it please the Court, my name is Rachel Herron on behalf of the federal government. With the Court's permission, I'd like to reserve about two minutes of time for rebuttal. Sure. The plaintiff in this case, an individual member of the three affiliated tribes of the Fort Berthold Reservation, seeks to overturn the results of a 2013 election administered by the Department of the Interior based on readings of tribal law and federal law that had been rejected by the tribe and the agency, respectively. The government's briefs explain why plaintiff's arguments fail on the merits, but I'd like to start today by addressing the threshold question that was identified in this Court's recent order, which is whether plaintiff has Article 3 standing to raise his arguments that Interior allegedly violated tribal and federal law in the first place. Upon consideration of that issue, the government believes that the plaintiff has not, to this point in the litigation, met his burden of demonstrating a particularized injury. To the extent this Court is willing to give plaintiff the opportunity to demonstrate an injury, plaintiff's burden, in the government's view, would be to demonstrate that he is personally impacted by the tribal constitutional amendments that became effective as a result of the alleged misapplication of tribal and federal law. The government would note that plaintiff has not made any such argument up to this point in the case, neither in his submissions to the agency nor in his briefs to the Court. Your Honors, I'm happy to elaborate further on the government's standing issues here, unless there are specific questions on standing that the Court would like to hear the government answer first. There's a regulation by Interior that allows individual members to challenge votes, and so allowed, certainly at least at the administrative level, this type of challenge. I don't think there's any dispute about that. My question is, what is the origin of that regulation? I didn't see anything sort of in the Indian Reorganization Act that would have been, you know, that was drawing upon or purporting to interpret, and so what I was trying to, in thinking about standing here, was understand what the basis was for Interior in recognizing that right, or maybe creating that right, you have to tell me which, in that regulation. Is there something about the historic trust relationship, historic practice with tribes, that allows these type of challenges in a way that seems different from elections? Yeah, so Your Honor, the regulation in question, you're correct, allows any member who has voted to challenge. I will say that in practice, the IBIA, which is the body within Interior that hears the appeals within the agency from these challenges, does apply standing principles as a matter of what they call administrative prudence, and there are IBA decisions I can point Your Honors to that make that point. So it's not as though that there is sort of no concept whatsoever of standing in these administrative challenges, although we acknowledge that the IBIA here did not make any findings with regard to Mr. Hudson's standing. In terms of the origin of the regulation, I think that I view this regulation as, you know, Section 5123A1 of the statute gives the Secretary the authority to promulgate rules and regulations which will govern the conduct of these secretarial elections. And this mechanism for voters bringing a challenge is simply one regulation that Interior has promulgated. I am not aware of any view by Interior that, you know, this is sort of a necessary feature as a result of the trust relationship or something like that. When the IBIA has applied standing to these voter challenges, what types of voter challenges have met that standing threshold? I mean, I don't have three, but just an example. Yeah, so the, you know, I think the one example that I have here today for the Court is, I think, one in which they found that there was not standing. So I can't, standing here today, give you an example of a time where the, you know, IBIA has made an affirmative finding that there was standing to proceed. But I think that the analysis would proceed similarly to sort of what the government is saying here would apply in the Article III context in the federal courts, in that you would need to show some personalized impact from the decision, in this case, the approval and making effective of these constitutional changes. It would not be enough simply to have an interest in making sure that the agency is applying law correctly or correctly in the challenger's view. Standing alone, no matter how, you know, sincerely held up belief is, as you know, the Supreme Court has affirmed just this term in the Carney v. Adams decision. Can you just give us an example of what would be enough? Sure. So, you know, I think... In this case, I mean, on the facts of this case. Sure. So I think one of the difficulties here is that it's not immediately obvious from the amendments that are in question, which have to do with the composition of the Tribal Business Council, how this particular plaintiff would be able to show a particularized injury. But you could... I mean, I think that you could posit, for example, with regard to the First Amendment that went into effect as a result of the 2013 election, which increases the size of the Tribal Business Council. Potentially, you could imagine a, you know, sitting member of that council whose vote would be diluted by the inclusion of new members on that council and the expansion of the body being able to show that they are injured in a particular way. You know, and also, you know, you could imagine different kinds of amendments that would have a, you know, a clear impact on just a non-governing member of the tribe, for example, something that went to membership criteria, something that, you know, changed, you know, the ability or the eligibility of voters to vote in future elections. In those kinds of situations, I think a plaintiff would be able to readily show that they are personally impacted. And there's been no showing of that here. And as I've said, it's not, it's far from clear to the government how the plaintiff would be able to make such a showing in this case, given the nature of the amendments. And on that point, I would add as well that in thinking about whether the plaintiff can show a personalized impact from these amendments, it's also important to keep in mind that in large measure, the 2013 amendments and particularly the first amendment that was approved in 2013 was actually rolled back by a 2016 secretarial election that plaintiff separately challenges in another lawsuit that's you know, there are, I think, a number of hurdles to be able to the plaintiff being able to show up a particularized impact here. Is it true that the 2013 changes never actually took effect? That's what, that's what Mr. Hudson said in opposing remand. And so the council never really implemented the change, at least the expansion, say in the number of felony, anybody involved in felonies that that would have come up at all. Hopefully not. And then it was, as you said, sort of undone in 2016. So I'm trying to figure out whether it was even, there was ever any on the ground practical implementation of the 2013 provisions, any challenges that you're aware of? Your Honor, I don't, I'm not aware of that. You know, the record obviously that we have before us only goes to the state of things after 2013. I'm not aware of what happened in terms of the tribe's actual implementation after 2013, other than, you know, to note that there was a relatively short period of time in which this, these changes could have even come about before we had this 2016 election that changed the legal state of play again. Just to, I'm sorry, just clarify one more thing. The 2013 election authorized an increase in the size of the business council, but didn't that election didn't actually increase the size of the business council? Was that supposed to happen at like the next election? I think the, the text of the amendment, which is at JA 234 sort of spells out what the sequence would be in terms of when the elections would be held to add these new members. But as far as I'm aware, it's not like there was sort of a slate in place when the 2013 amendment was. And those other elections were not held to increase. That's my understanding, Your Honor. I see I'm running out of time. So I would simply note on the merits that the plaintiff that the government, to the extent this court reaches the merits stands by the arguments that it makes in its brief on those issues. And to the extent this court has any questions on them now, or in any rebuttal time that may remain, I'm happy to answer them. Otherwise the government would ask for it to vacate the decision below. Okay. Thank you, Ms. Heron. We'll hear from Applee now, Mr. Sullivan. Thank you. May it please the court. My name is Patrick Sullivan representing Applee Charles Hudson. We ask that this court affirm the district court and hold that interiors misinterpretation of the IRA and article 10 by erasing the tribal quorum was, is arbitrary, capricious and contrary to the statute. But I do want to address the issues as well that from your order, this court does have article three standing. I'm surprised to hear that we're focused on the particularized prong, but I am glad to, first of all, I, my the clearest signal that this is a particularized injury is that the is, is the regulation that judge Millett referred to, which narrows that the, the people who can actually challenge that election to not just any voter, but down to those who, well, not to any member, but any qualified voter. And then again, Mr. Hudson actually did vote in that election. And I think the standard that the department of justice is putting forward is that somehow what we need to do is look at whether Mr. Hudson's, whether the outcome affected him and injured him, which, which really is counterintuitive. I mean, I think if you expand that logic, you would think that not getting your choice of a presidential candidate would be seen as some kind of particularized injury. It requires going into Mr. Hudson's brain and examining his personal policy preferences. What, what, what is his injury? What is, what is the injury on which you base article your claim of article three standing? It's the diminishment of his vote. So, but for interior's practice, this amendment wouldn't have happened because and that's a, that's a personal injury. If you look at Gill versus Whitford, that what's happened is that his vote now carries less weight. So a vote dilution theory. Yeah, it's, it's, it's, it's, it's diluted or it's diminished relative to the outcome that he votes in. I mean, it would seem, would seem that he has not a vote dilution injury, but a vote concentration benefit. They're enforcing, they're making a quorum requirement too strict in your view, the effect of which is to give the people who vote a greater vote. How so? I understand, but the violation of the statute is not a benefit to him. And, but when you vote, you can vote in the negative or in the positive. Here, Mr. Hudson opposed the amendment. And so what happened then is the interior's practice denies him the benefit of non-votes being counted as no votes toward the quorum. And so it makes his preferred outcome less likely vis-a-vis his one vote when he votes. In your example, when he supports amendment, that amendment is indeed more likely to pass, but then his voting power is diminished in another way because that amendment is then vulnerable to a subsequent later unlawful secretarial election conducted by interior without the requisite solemnity and formality. I'm sorry, what, what's the causal connection between the, the fight here over how the quorum requirement works and the fact that his position in the election didn't prevail? Those would seem to be just different issues. Well, they're, they're tied by the fact that if interior respected the quorum that's in the article 10 in an IRA, there would have been a different outcome. So you don't have to look at the injury to Mr. Hudson and, and because that, that, by the way, that would put the court in an untenable position of evaluating which injuries, you know, which personal injuries in terms of political outcomes of various types of elections are justiciable. I wouldn't ask this a very sticky situation for the court to delve into, but here, the injury is really to his vote and the, and the, the, the practice, can we talk about positive and negative votes? Those things add up to the fact that it puts my client on a day-to-day basis in an, on a, in a defensive position because the constitution provides for things like his enrollment status. He could be disenrolled. It provides for his rights vis-a-vis his allotted lands. He's a landowner on the If, suppose he didn't vote, but he opposed the measure, then it seems like someone in that position could say the same thing because they, they could say that, well, I wish the, the, what you believe to be the proper quorum requirement was enforced because if it had been, then the measure wouldn't have been adopted. And I don't like that. I don't like the outcome that exists now because the measure was treated as having been adopted. And it seems like the, the fact of voting then doesn't really matter that much because the vote, as Judge Katz has pointed out, was, was counted and was maximized. But the injury is just a disag, the asserted injury is disaggregated from it because that would be the same for somebody who didn't vote at all. And, and I think it's pretty clear that if somebody didn't vote at all, they can't claim an injury in this context. Well, I, I understand your hypothetical in which my client didn't vote. And I, I did mention that there, there is an injury in, as I spoke, even, even to those who don't vote, but that's not what we're asserting here. What we're asserting here is that when Mr. Hudson's, when Mr. Hudson did vote, he, the outcome changed based on interior's practice, but it wouldn't have even had to have changed to have diminished his vote. I mean, if you look at the courts didn't delve into what, what, whether they wanted a Democrat or a Republican winner or what those policies, Democratic policies or Republican policies would have affected those voters, that would be an impossible position to put the court in. And so that's why we, In those cases, the vote, the change in vote was vis-a-vis other voters. You have, your vote has less power than other voters. It's not about your ability to obtain particular outcome, desired outcomes or preserve them. And so what I'm trying to understand under this, we have to ask not generically about this election process, but this 2013 election, because that's the one that's challenged. And so in voting in the 2013 constitutional amendment election, was his vote any more or less potent, I guess, than other voters? Yes, your honor, his vote was less potent than those who voted in favor of that amendment. So it's not another class of voter, but in terms of, it was disadvantaged in terms of his vote because he happened to vote against that amendment. So that's where I'm, that's where I'm going. And I think, and it's true that, you know, I mean, his, his, his preference would have been, and the reason that he expressed to me that he voted against 2013 is that it, it didn't expand tribal off-reservation voting rights. He has a separate particular. But the, the 2013 changes that he voted against never took effect, right? You told the district court in your opposition to remand that they never had been implemented. So how was he injured his vote? He cast a vote just like everyone else. It was counted just like everyone else's account carry the same weight as anyone else's pro or con that actually voted in that you said it's because he opposed it, but the things he opposed never took effect. So I'm just trying to understand, because that's what we're deciding here is this 2013 election. To be fair, they never took effect because of Mr. Hudson's lawsuit. They would have taken effect if he hadn't sued that, you know, brought his original case, you know, way back then, nothing to do with the standing question that I'm asking you. All right. And that is, how was he injured by, you say he voted against something that never took effect and his vote, I think vis-a-vis other voters was the same, just you vote pro or con. Right. Well, your vote is his vote was diminished versus those pros, but let me go, you know, I think that the Gill and Baker cases really show that this, that I think this court may be looking further than it needs to in terms of the injury, because what we're looking for is just a plain, direct and adequate interest in maintaining the effectiveness of one's vote. That's the interest recognized in Baker v. Carr. But I also want to point the court at a couple of other cases, for example, in Carlson v. Postal Reg Commission, the plaintiff there established standing based on the difference in the price of a postage stamp. So consider whether that's more or less of a particularized and concrete injury than what we have here. You can also look at the sweeping district court rulings in Harjo v. Kleppe, which provide that in which the plaintiffs challenged essentially the government to government relationship between the United States and their Indian tribe. So if the court assumed standing there, which it did, then my client, I argue that my client should also be able to establish standing here. I see a lot of time. Let me make sure my colleagues don't have further questions. Okay. Thank you, Mr. Sullivan. Ms. Heron, we'll give you two minutes for rebuttal. Thank you, Your Honor. So I would just touch very quickly on this issue of whether there's a voter dilution injury that can be shown here. And in the government's view, this is just, a voter dilution case. Voter dilution is an injury that tends to, that generally comes up in a situation as the panel has noted, where an individual's vote, the power of that vote is being distorted as compared to other voters. Here, I think the right way to conceptualize the way these secretarial election work is that there are two separate hurdles that a proposed amendment needs to clear. And one is that it needs to get the majority of votes cast. And in that context is where you could potentially be concerned about some sort of a dilution argument to the extent some way, the way that the votes are cast, it amplifies the power of certain voters over other voters. But then there is this separate hurdle that needs to be cleared. And that hurdle is the meeting of the quorum requirement. And that quorum requirement applies uniformly. As Chief Judge Narbasa noted, the effect that it has is felt alike by voters and non-voters alike. And I think that that separate issue just is distinct from the way that votes are weighed in the majority vote context, which is where you could potentially see a voter dilution claim. The only other point that I would note is that on this issue of the fact that the plaintiff filed an administrative petition, Massachusetts v. EPA, among other cases, Stanford show very clearly that the fact that there is a particular right to bring an administrative petition does not mean that the plaintiff does not then need to show an Article III injury in order to challenge a denial of that petition in the federal courts. For these reasons, the government would ask that this court vacate the decision below of it for lack of standing, or if it reaches the merits for the reasons stated in the government's brief. Thank you, counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan, Millett, Katsas